**C. MOSS, as Guardian for E. Roth, Petitioner,**

v.

**A.J. DAVIS, Respondent.**

No. CN00–11342.

Family Court of Delaware, New Castle County.

Submitted: May 24, 2001.
Decided: June 5, 2001.

Michael K. Newell, of Connolly, Bove, Lodge & Hutz, P.A., Wilmington, for Petitioner.

Joel D. Tenenbaum, of Woloshin, Tenenbaum, Lynch, Natalie & Freibott, P.A., Wilmington, for Respondent.

1. Ms. Moss was appointed by Chancery Court

CONNER, Judge.

The above parties are before the Court on the petition of C. Moss, Court of Chancery Appointed Guardian[1] for the Person of E. Roth, to annul her marriage to A.J. Davis. These parties were married in Elkton, Cecil County, Maryland, on May 1, 2000, after living together for approximately twelve years. It was a short wedding ceremony. No family or friends attended. No family members or friends were advised of the wedding in advance. No friends or family members on either side were advised of the marriage for several days after it took place. At the time of the marriage, E. Roth was 86 years of age and suffering from moderate Alzheimer's Disease. A.J. Davis was 76 years of age at the time. The petition alleges that Ms. Roth lacked the mental capacity to consent to the marriage and alternatively was forced to enter into the marriage through duress.

The Delaware Annulment Statute, 13 Del. C. § 1506, on annulment provides in pertinent part as follows:

§ 1506. Annulment.

(a) The Court shall enter a decree of annulment of a marriage entered into under any of the following circumstances:

(1) A party lacked capacity to consent to the marriage at the time the marriage was solemnized, either because of mental incapacity or infirmity, or because of the influence of alcohol, drugs or other incapacitating substances;

(5) One or both parties entered into the marriage under duress exercised by the other party, or a third party, whether or not such other party knew of such exercise of duress;

■ To have a marriage annulled on the grounds of coercion or duress, there

Order dated November 8, 2000.

must be clear and convincing evidence of the duress. *Fluharty v. Fluharty*, 193 A. 838, (Del.Super.Ct.1937). Duress is legally defined as, "unlawful constraint exercised upon a person whereby he or she is forced to do some act that he or she otherwise would not have done"; *Black's Law Dictionary*, Fourth Edition. Under Delaware law, there are three basic elements of duress: (1) a wrongful act; which (2) overcomes the will of a person; who (3) has no adequate legal remedy to protect their interest; *Way Road Development Company v. Savannah Land Company*, 1992 WL 19969 (Del.Super.).

■ The guardian alleges that duress was proven by circumstantial evidence. The chain of circumstances started in February 2000, when Mr. Davis' daughter's name was placed on an MBNA CD of Ms. Roth that had matured and was being renewed. When Ms. Roth's daughters, C. Moss and S. Coates, learned of the titling of their mother's CD, they took her to her doctor of fourteen years, Gary Beste, M.D. Dr. Beste tested Ms. Roth for dementia and ruled out all causes except Alzheimer's Disease. He found affirmative evidence of Alzheimer's from a standardized test, the "mini mental" test. Based on his diagnosis, he supplied a letter which activated a Power of Attorney, executed by Ms. Roth in 1991, designating her daughter, C. Moss, as her attorney-in-fact to handle her financial affairs. Ms. Moss was able to have the MBNA CD re-titled solely in her mother's name.

Ms. Roth became upset with her daughter invoking the Power of Attorney and removing her financial independence. With Mr. Davis' assistance, or perhaps at his suggestion, she contacted two attorneys, Piet vanOgtrop, Esquire and Elwood T. Eveland, Jr., Esquire, to inquire about revoking the Power of Attorney. Marriage was discussed with both attorneys.

Mr. Eveland prepared a revocation document. Ms. Roth and Mr. Davis went to Elkton, got a license, and returned for a marriage ceremony.

These circumstances do not come close to constituting duress. The subject of marriage was discussed with two attorneys. Mr. Davis may have been very persuasive, but persuasion is not duress. There is insufficient evidence of a wrongful act on his part. There is no evidence of any coercion. Thus, duress was not proven by even a preponderance of the evidence.

■ Before determining whether Ms. Roth had the requisite capacity to consent to her marriage or lacked the ability to consent because of mental incapacity, the Court must make a threshold evidentiary ruling on whether the specific conversations between Ms. Roth and two Delaware attorneys can be admitted and considered. As alluded to, on March 1, 2000, Ms. Roth and Mr. Davis, both former clients of Piet vanOgtrop, Esquire, met with Mr. vanOgtrop in his office to obtain general information concerning revocation of the aforesaid Power of Attorney that Mr. vanOgtrop had prepared for Ms. Roth in 1991. Mr. vanOgtrop considered both Ms. Roth and Mr. Davis to be his clients. Mr. vanOgtrop engaged in some general discussion at this one meeting, but prepared no legal documents and took no further action on behalf of either Ms. Roth or Mr. Davis.

Elwood T. Eveland, Jr., Esquire, met with Ms. Roth on several occasions between February and December of 2000. According to Mr. Eveland, Ms. Roth was clearly his client and except for the very first meeting, Mr. Davis was present at all of the sessions. The Court must rule on Ms. Moss' objection based on attorney-client privilege to the conversations between Ms. Roth and Mr. vanOgtrop, and

Ms. Roth and Mr. Eveland being admitted into evidence.

The lawyer-client privilege is set forth at Rule 502 of the Delaware Uniform Rules of Evidence. Rule 502(c) provides as follows:

(c) *Who may claim the privilege.* The privilege may be claimed by the client, his guardian or conservator, the personal representative of a deceased client or the successor, trustee or similar representative of a corporation, association, or other organization, whether or not in existence. The person who was the lawyer or the lawyer's representative at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the client.

■ The above section clearly gives Ms. Moss, as guardian for the client, standing to object to the admission into evidence of the conversations between Mr. vanOgtrop and Ms. Roth, and, Mr. Eveland and Ms. Roth. Mr. Davis argues that the privilege was waived in regard to the conversation between Mr. vanOgtrop and Ms. Roth, due to his presence. It is true that an attorney-client privilege may be waived by the public disclosure of information that was formerly confidential; *Texaco, Inc. v. Phoenix Steel*, 264 A.2d 523, (Del.Ch.1970). The mere presence of another client in the lawyer's office does not rise to the level of a public disclosure. If one of two clients who are meeting with an attorney invokes the attorney-client privilege, the privilege must be upheld regardless of whether it is the other client who wishes that the content of the conversation be revealed. Thus, the presence of Mr. Davis at the sessions between Mr. vanOgtrop and Ms. Roth, and Mr. Eveland and Ms. Roth, does not constitute a waiver of the privilege.

■ In the case of Mr. Eveland's representation, Mr. Davis points out that Mr. Eveland, as an attorney in the Court of Chancery guardianship action, submitted an affidavit as an attorney for an alleged infirm person. He argues that this affidavit is of public record and thus, the privilege is waived. Mr. Eveland's affidavit was in great detail and contained both Mr. Eveland's observations about Ms. Roth's memory and a specific discussion of her comments and his advice to her during several meetings. The Court does not find this affidavit to waive the attorney-client privilege, since Ms. Moss had not been appointed the guardian for Ms. Roth at the time the affidavit was filed in the Court of Chancery, and was not in a position to exert the privilege. In a proceeding about Ms. Roth's mental competency, there was no one to invoke the privilege. If it could not be invoked, it could not be waived.

■ The Court, therefore, excludes any consideration of the actual conversations between Ms. Roth and either of her attorneys. The Court, however, can consider their impressions and opinions as to her mental capacity at the various times they met with her and made their observations. It was Mr. vanOgtrop's opinion that Ms. Roth knew what she was discussing and what she wanted to do on March 1, 2000. Mr. Eveland testified that he was satisfied that she was oriented and had a good idea about what she wanted to do. Mr. Eveland, however, noted that in his initial session with her on March 9, 2000, that she conveyed and displayed a failure of memory of some significant proportion. Concerning his meeting with her on March 17, 2000, he reported that, *I was of the conclusion that, although Ms. Roth was suffering from a loss of memory that was substantial, she was fully aware of her surroundings, fully aware of who I was, and why she was taking the action she was taking....* The opinions of these two experienced attorneys must be balanced against

the opinion of Gary Beste, M.D., Ms. Roth's personal physician for approximately fourteen years. Although Dr. Beste is engaged in a general family practice, he has a specialty in Geriatrics and has been board certified for the past eight years in that specialty. On February 18, 2000, not quite three months before Ms. Roth's marriage, he examined Ms. Roth's memory loss and administered a standardized test used in the medical profession to diagnose and measure Alzheimer's Disease. The test known as "the mini mental test" consists of thirty questions. Dr. Beste had previously administered this test to Ms. Roth in 1998, at which time she got twenty-seven answers correct. In February 2000, she answered seventeen questions correctly. One question that she missed was what season it was. Dr. Beste found this a significant miss, as it was snowing that day. Dr. Beste described the scale for Alzheimer's as twenty to thirty correct answers indicating mild Alzheimer's, ten to twenty correct answers indicating moderate Alzheimer's, and zero to ten correct answers indicating severe Alzheimer's. Ms. Roth, therefore, was diagnosed with moderate Alzheimer's in February 2000, which accounted for her memory lapses and, according to Dr. Beste, rendered her incapable of learning the important facts of a given situation, properly interpreting those facts that she could learn, and reaching a rational conclusion. In Dr. Beste's opinion, since Alzheimer's is a progressive and not a regressive disease, Ms. Roth lacked the mental capacity to understand the consequences of her marriage in May of 2000, and therefore, to knowingly consent to it. Dr. Beste also had a CAT Scan and a blood test performed which excluded other possible organic causes of her memory loss and mental infirmity, such as Vitamin B12 deficiency, folic acid deficiency, low potassium levels, or stroke.

In comparing and weighing Dr. Beste's opinion against the opinions of Mr. vanOgtrop and Mr. Eveland, it must be noted that Dr. Beste is a medical doctor, specializing in geriatric problems, who based his opinion on not only his observations, but on exclusionary medical testing and the 1998 and 2000 results of the standardized test for Alzheimer's, a commonly used diagnostic tool currently utilized by the medical profession to determine and measure Alzheimer's Disease. The opinions of non-medically trained professional lawyers, based solely on observation, cannot be given greater weight than the opinion of this particular physician, who specializes in geriatric problems, has been treating and observing Ms. Roth for fourteen years, and is based upon testing.

It is unfortunate that we do not know as much about Alzheimer's Disease as we would like to know. We do not know how to prevent it or how to achieve remission. We do know that it causes memory loss and diminishes the ability to learn and analyze facts and basically to reason. All of the witnesses in this case noticed Ms. Roth's memory loss. Dr. Beste explained the impairment caused by Alzheimer's to her reasoning. The Court must accept the opinion of Dr. Beste, despite the high regard that it has for the professional abilities of Mr. vanOgtrop and Mr. Eveland. The doctor has received substantial training and has great experience in dealing with older patients with diminished mental capacity, while the attorneys have no such training and only limited experience with these mental conditions. The Court recognizes that they have to pass on a person's competency before preparing their Will. In this case, no other medical experts were presented to counter Dr. Beste's opinion, or to dispute his explanation of the effects of this debilitating disease. Due to her Alzheimer's condition, which was moderately advanced three months prior to her

marriage, and the progressive nature of the disease, this Court is convinced that Ms. Roth lacked the ability to interpret important facts about her pending marriage and reach a rational conclusion about the ramifications of remarrying at age 86 under all her circumstances including her financial situation.

The medical opinion of Dr. Beste was substantiated by Mr. Davis' acknowledgment that Ms. Roth had forgotten several times in the days prior to their marriage that she was going to be married and by the testimony of her good friend, G. Dill, that she did not remember that she was married one week after the marriage.

C. Moss, the guardian for E. Roth, has proved with clear and convincing uncontroverted medical evidence, that Ms. Roth lacked the capacity to consent to her marriage at the time it was solemnized on May 1, 2000, due to her mental incapacity caused by Alzheimer's Disease. The Petition for Annulment **IS GRANTED**.

**IT IS SO ORDERED.**